UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT E. EVANS, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| vs. | § | CIVIL ACTION NO. 4:07-cv-625 |
| | § | |
| STERLING CHEMICALS INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

### I.      INTRODUCTION

Before the Court are the defendants', Sterling Chemicals, Inc. ("Sterling"), Sterling Chemicals, Inc. Employee Benefits Plans Committee (the "Committee"), Sterling Chemicals, Inc. Medical Benefits Plan for Retirees ("Medical Benefits Plan"), and Sterling Chemicals, Inc. Prescription Drug Benefits Plan for Retirees ("Prescription Benefits Plan."), ("Medical Benefits Plan" and "Prescription Benefits Plan" collectively referred to as the "Plan.") ("Sterling," the "Committee" and the "Plan" are jointly referred to as the "defendants") motion for judgment on partial findings and post-trial memorandum of law (Docket Entry Nos. 144 & 161), the plaintiffs', Robert Evans, Relmond Hamilton and Dennis Harthun (collectively, the "plaintiffs"), response in opposition to the defendants' motion for judgment and post-trial brief (Docket Entry Nos. 151 & 162), the defendants' response to the plaintiffs' post-trial brief (Docket Entry No. 163) and the plaintiffs' reply to the defendants' post-trial brief (Docket Entry No. 164).[1]  After the conclusion of the trial in this matter and after having carefully reviewed the parties'

---

[1] On April 12, 2010, the defendants filed a letter brief with this Court notifying it of the United States Supreme Court's recent decision in *United Student Aid Funds, Inc. v. Espinosa*, ___ U.S. ___, 130 S. Ct. 1367, 1378, 176 L. Ed.2d 158 (2010), and setting forth how they believed *Espinosa* influences this Court's decision in the instant action.  (*See* Docket Entry No. 165)  On April 15, 2010, the plaintiffs filed a response.  (*See* Docket Entry No. 166).

submissions, the record, the evidence admitted at trial and the applicable law, the Court determines that judgment for the defendants should be rendered on all claims asserted by the plaintiffs.  Pursuant to FED. R. CIV. P. 52(c) and as permitted by Rule 52(a), the Court sets forth its findings of fact and conclusions of law in this Memorandum Opinion and Order.

## II.    FACTUAL BACKGROUND

The plaintiffs, Robert Evans ("Evans"), Relmond Hamilton ("Hamilton") and Dennis Harthun ("Harthun") (collectively, the "plaintiffs" or "Sterling Fibers retirees"), are former employees of Cytec, Industries, Inc. ("Cytec") and its predecessor, American Cyanide Corporation.  In January of 1994, the American Cyanamid Corporation spun off its fibers business unit into Cytec Acrylic Fibers, Inc. ("Cytec Acrylic"), Cytec Technology Corp. ("Cytec Technology"), and Cytec Industries, Inc. ("Cytec Industries) (collectively "Cytec").  In 1996, Cytec sold the assets of their acrylic fibers' business to Sterling Fibers, Inc. ("Sterling Fibers"), a wholly-owned subsidiary of Sterling Chemicals, Inc.  The sale consummation is evidenced by an Asset Purchase Agreement dated December 23, 1996 (the "APA").[2]

As part of the APA, Sterling agreed to offer employment in comparable positions to certain employees of Cytec, designated as "Business Employees."  The "Business Employees" who accepted employment with Sterling were termed, "Acquired Employees."  Also included in the APA was a provision devoted to post-retirement benefits that Sterling would provide to the "Acquired Employees."  Specifically, Section 5.05(f) provided, in relevant part, as follows:

> Post-retirement Benefits.  Notwithstanding anything to the contrary contained herein, with respect to any Acquired Employee who, as of the Closing Date, (i) was at least 55 years old and had completed at least 10 years of service with any of the Cytec Parties (including, prior to January 1, 1994, Cyanamid) or any of their respective Affiliates, (ii) at July 31, 1990, had combined age plus years of service with Cyanamid equal to at least 65, or (iii) is identified on Schedule

---

[2] Sterling Fibers, Sterling Chemicals, Inc. and Sterling Chemicals Holdings, Inc. were all parties to the APA.  These entities are collectively referred to as "Sterling."

5.05(f) and who remains employed by Purchaser[3] until the later of such Acquired Employee's 55th birthday or the time such Acquired Employee has at least 10 years of service with the Cytec Parties (including, prior to January 1, 1994, Cyanamid), Purchaser or any of their respective Affiliates, Purchaser shall continue to provide postretirement medical and life insurance benefits for such Acquired Employee[s] that are no less favorable to such Acquired Employee than those benefits provided by Parent[4] or Seller under the plans set forth on Schedule 4.01(s) as in effect on the date hereof, and Purchaser shall not reduce the level of such benefits without the prior written consent of Parent; provided, that such consent shall not be withheld to the extent that any of the Cytec Parties or Cyanamid has similarly reduced the level of such benefits.  For purposes of this Agreement, an increase in premiums required to be paid for postretirement benefits shall be considered a reduction in such benefits.  Parent shall notify Purchaser in writing to the extent that Parent becomes aware of a reduction of postretirement medical and life insurance benefits under the plans set forth on Schedule 4.01(s).

(Pls.' Trial Ex. 4 at Sterling 1683 - 84.)

After the acquisition, the plaintiffs became employees of Sterling Fibers and participants in Sterling's employee benefit plans, including the Medical Benefits Plan and the Prescription Benefits Plan.  Evans retired from Sterling Fibers in 1998 and Hamilton and Harthun, each retired from there in 2001.  Upon their retirement, each of them began receiving post-retirement medical benefits in accordance with the Plan and the APA.  At that time, their monthly premiums for their medical and prescription drug benefits were $67.50, $14.73 and $83.45, respectively.

On July 16, 2001, Sterling Fibers, along with numerous Sterling entities, filed a voluntary petition for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code.  On that same date, Sterling sent letters to its retirees, surviving spouses of its retirees and vested participants of its Plan notifying them that it had commenced an action for bankruptcy pursuant to Chapter 11 and further informing them that it did not expect to see any changes in its programs, including its pension and retiree medical plans.  Additionally, a Proof of Claim form

---

[3] The term "Purchaser" is defined in the APA to mean Sterling Fibers.  (Pls.' Trial Ex. 4 at Sterling 1623, 1639.)

[4] The term "Parent" or "Seller" is defined in the APA to mean Cytec.  (*Id.* at Sterling 1623, 1637.)

was also sent to the plaintiffs during the pendency of Sterling's bankruptcy.  (Defs.' Trial Exs. 77 - 79.)

On October 18, 2002, Sterling filed "Debtors' Eighth Expedited Omnibus Motion for Order Under 11 U.S.C. § 365(a) Authorizing Rejection of Miscellaneous Executory Agreements."  The APA was among the executory agreements addressed in this motion.  On November 13, 2002, the bankruptcy court signed an order granting the motion and authorizing rejection of the APA.  On November 20, 2002, the bankruptcy court entered an order confirming Sterling's Joint Plan of Reorganization, which became effective on December 19, 2002.

The plaintiffs allege that during the pendency of the bankruptcy proceeding and for a short while thereafter, the defendants continued to provide them with medical benefits according to the terms of the Plan and in accordance with the APA.  On or about February 21, 2003, however, the defendants informed the plaintiffs of their decision to increase premiums for retirees in stages over a two-year period.  The increased premiums became effective April 1, 2003.  The defendants raised premiums again on January 1, 2004 and January 1, 2005.

On February 16, 2007, the plaintiffs commenced the instant action against the defendants seeking:  (1) a declaration that the defendants are obligated under ERISA to provide medical benefits as provided in the Plan as amended and modified by the APA; (2) a declaratory judgment and preliminary and permanent injunction requiring the defendants to maintain the level of retiree health care benefits as promised in the Plan; (3) reimbursement for any costs incurred as a result of any modification or termination of retiree benefits by the defendants; (4) an order requiring fiduciaries to "make good to the [P]lan any losses" resulting from their breach of fiduciary duty; (5) an award of actual, consequential and incidental damages; and (6) an award of attorneys' fees and costs.

On March, 20, 2008, the plaintiffs moved this Court for an Order staying the case pending their exhaustion of their administrative remedies.  (*See* Docket Entry No. 66).  On March 25, 2008, the Court entered an Order granting the plaintiffs' motion to stay.  (*See* Docket Entry No. 71).  On March 28, 2008, the plaintiffs filed their initial claim with the Committee, the plan administrator for the Plans.  (Pl.'s Tr. Ex. 139).  On April 10, 2008, upon the plaintiffs' motion for reconsideration, this Court entered an Order modifying the terms of the stay previously imposed.  (*See* Docket Entry No. 75).  On April 22, 2008, the defendants submitted their response to the plaintiffs' motion for summary judgment to the Committee.  (Docket Entry No. 82, Ex. A.)  On April 30, 2008, the Committee issued its initial decision denying the plaintiffs' claim and further indicating the following findings:  (1) the APA did not amend the Plan; (2) Sterling Fiber's contractual obligation to Cytec pursuant to the APA was terminated when the APA was rejected in bankruptcy; and (3) the increase in premiums charged to Sterling Fibers' retirees in 2003 was permitted by the Plan.  (Pls.' Tr. Ex. 142).  In its written denial, the Committee also explained the plaintiffs' rights to an appeal and the procedure for initiating such. (*Id.*)

On June 6, 2008, the plaintiffs' appealed the Committee's denial.  (Pls.' Tr. Ex. 143).  On July 29, 2008, the plaintiffs and their attorneys appeared before the Committee and presented their evidence and arguments in support of their claim.  (Pls.' Tr. Ex. 144).  On August 12, 2008, the Committee denied the plaintiffs' appeal and issued its final determination.  (*Id.*)  On August 22, 2008, after having exhausted the administrative procedures under the Plan, the parties filed an agreed motion requesting that this Court lift the stay imposed.  (*See* Docket Entry No. 77).  On August 25, 2008, this Court entered an order granting the parties' motion to lift the stay.  (*See* Docket Entry No. 78).

The plaintiffs assert the following four claims against the defendants:  (1) denial of benefits under the Plan in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B))[5]; (2) breach of fiduciary duty on behalf of the Plan under § § 409 and 502(a)(2) of ERISA, 29 U.S.C.§ 1132(a)(2)[6]; breach of fiduciary duty under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)[7]; and (4) ERISA-estoppel.  On November 19, 2008, the Court certified the plaintiffs' § 502(a)(1)(B) claims to recover benefits as a class action.  Certification with regard to the plaintiffs' other claims was denied and such claims are being brought only on behalf of the three named plaintiffs.

A bifurcated trial of this matter was held on November 10, 12 and 13, 2009.  After the plaintiffs' rested their case-in-chief, the defendants moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure (*See* Docket Entry No. 144).  The Court exercised its discretion and took the motion under advisement.  At the close of trial, the parties requested leave to submit additional briefing on the issues presented at trial as well as the expert testimony developed.  The Court granted the parties leave to file post-trial briefing within 30 days after their receipt of the trial transcripts.  On February 24, 2010, the parties filed their respective post-trial memoranda.  Additional responses and replies were filed thereafter.

---

[5] Section 502(a)(1)(B) allows a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

[6] Section 502(a)(2) authorizes an action by a participant or beneficiary against "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."  29 U.S.C. § 1132(a)(2); *see also* 29 U.S.C. § 1109.

[7] Section 502(a)(3) permits a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).

## III.     STANDARDS OF REVIEW

### A.     Standard of Review Under FED. R. CIV. P. 52(c)

Rule 52(c) of the Federal Rules of Civil Procedure provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  FED. R. CIV. P. 52(c).  To this end, a court entering judgment pursuant to Rule 52(c) "must find the facts specially and state its conclusions of law separately" as denoted in Rule 52(a).  *Id.*; FED. R. CIV. P. 52(a)(1).  Nevertheless, "Rule 52(a) does not require that the district court set out [its] findings on all factual questions that arise in a case."  *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1054 (5th Cir. 1997) (citing *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 433 (5th Cir. 1977)).  Nor does it demand "punctilious detail [or] slavish tracing of the claims issue by issue and witness by witness."  *Century Marine Inc. v. U.S.*, 153 F.3d 225, 231 (5th Cir. 1998) (citing *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996) (quoting *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993)) (other citations omitted). Rather, a court's "[f]indings [are sufficient to] satisfy Rule 52 if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision."  *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985) (citing *Lujan v. New Mexico Health & Social Services Dept.*, 624 F.2d 968, 970 (10th Cir. 1980), citing *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422, 63 S. Ct. 1141, 1145, 87 L. Ed. 1485 (1943); *Stanley v. Henderson*, 597 F.2d 651 (8th Cir. 1979)).  "It is not necessary for the [d]istrict [c]ourt to go into minute details to state facts which are already admitted in the record.  *Interfirst Bank of Abilene*, 778 F.2d at 234 (citing *Jackson v. Marine Exploration Co.*, 614 F.2d 65 (5th Cir. 1980)).

Moreover, "[u]nlike the standard applicable in judgments as a matter of law, when dismissing a case pursuant to Rule 52(c), a court is not required to make any special inferences or review the facts in the light most favorable to the plaintiff." *Weber v. Gainey's Concrete Prods., Inc.*, No. 97-31267, 1998 WL 699047, at *1 n.1 (5th Cir. Sept. 21, 1998) (citing *Sanders v. General Servs. Admin.*, 707 F.2d 969, 971 (7th Cir. 1983)); *see also Ritchie v. U.S.*, 451 F.3d 1019, 1023 n.7 (9th Cir. 2006) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554 - 55, 110 S. Ct. 1331, 108 L. Ed.2d 504 (1990) ("The Supreme Court has held with respect to Rule 52(c)'s predecessor that the district court need not give the nonmoving party any favorable inferences.")). "A judgment on partial findings may be entered by the court 'at any time it can appropriately make a dispositive finding of fact on the evidence.'" *Weber*, 1998 WL 699047, *1 n.1 (citing Fed. R. Civ. P. 52 advisory committee's note).

## B.     Standard of Review Under ERISA

The United States Supreme Court has generally held that the denial of a right to benefits under an ERISA plan is reviewed under a *de novo* standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989); *see also Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 629 (5th Cir. 2004). However, where the benefit plan expressly confers the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan" on the plan administrator or fiduciary, the applicable standard of review is abuse of discretion. *Firestone*, 489 U.S. at 115, 109 S. Ct. 948; *Baker*, 364 F.3d at 629; *see also Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp.2d 724, 731 (S.D. Tex. 2005) (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999). Here, the Plan vests the Committee with discretionary authority to determine eligibility for benefits and

thus, the standard of review applicable is the abuse of discretion standard.  The relevant Plan

provision provides the following review authority:

> The Plan Administrator shall have complete authority to review all denied claims
> for benefits under the plans.   In exercising its responsibilities, the Plan
> Administrator shall have discretionary authority (1) to determine whether and to
> what extent covered persons are eligible for benefits, and (2) to construe disputed
> plan terms.  The Plan Administrator shall be deemed to have properly exercised
> such authority unless it has abused its discretion hereunder by acting arbitrarily
> and capriciously.

 (Docket Entry No. 48, Ex. 39 at 20 – 21.)

A plan administrator or fiduciary's factual determinations under an ERISA plan are also

reviewed pursuant to an abuse of discretion standard.  *Vercher v. Alexander & Alexander, Inc*.,

379 F.3d 222, 226 (5th Cir. 2004); *see also Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552,

1562 (5th Cir. 1991) (reasoning "for factual determinations under ERISA plans, the abuse of

discretion standard of review is the appropriate standard.").   "Under the abuse of discretion

standard, '[i]f the plan fiduciary's decision is supported by substantial evidence and is not

arbitrary and capricious, it must prevail.'"  *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d

389, 397 - 98 (5th Cir. 2007) (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d

262, 273 (5th Cir. 2004)).   "Substantial evidence is 'more than a scintilla, less than a

preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  *Id.*   "A decision is arbitrary when made 'without a rational connection

between the known facts and the decision or between the found facts and the evidence.'"  *Lain v.

UNUM Life Ins. Co. of America*, 279 F.3d 337, 342 (5th Cir. 2002) (quoting *Bellaire Gen. Hosp.

v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996)).   A plan administrator or

fiduciary's "decision to deny benefits must be 'based on evidence, even if disputable, that clearly

supports the basis for its denial.'" *Lain*, 279 F.3d at 342 (quoting *Vega v. Na'l Life Ins. Servs.*, *Inc.*, 188 F.3d 287, 299 (5th Cir. 1999)).

Ordinarily, when resolving factual controversies, the court's review is confined "to the evidence before the plan administrator." *Vega*, 188 F.3d at 299 (internal citations omitted); *see also Wilbur v. ARCO Chem. Co.*, 974 F.2d 631, 639 (5th Cir. 1992). It is not confined to the administrative record, however, when determining whether an administrator abused his discretion in interpreting the plan's terms and making a benefit determination. *Wilbur*, 974 F.2d at 639.

The Fifth Circuit usually employs a two-step analysis when determining whether an administrator has abused its discretion in construing the plan's terms. *James v. Louisiana Laborers Health and Welfare Fund*, 29 F.3d 1029, 1032-33 (5th Cir. 1994). First, the court must determine whether the plan administrator's interpretation was the legally correct interpretation. *Id.* Second, if the plan administrator's interpretation was not the legally correct interpretation, then the court must consider whether the administrator's interpretation amounts to an abuse of discretion. *Id.* But, "if the administrator's interpretation and application of the Plan is legally correct, then [the] inquiry ends because obviously no abuse of discretion has occurred." *Baker*, 364 F.3d at 629 – 30 (citing *Spacek v. Maritime Ass'n*, 134 F.3d 283, 292 (5th Cir. 1998)).

Further, where, as here, the role of the plan administrator presents a conflict of interest because it evaluates claims for benefits and pays benefits, the Court must consider this conflict as a factor in determining whether there has been an abuse of discretion. *Firestone*, 489 U.S. at 115, 109 S. Ct. 948 (citations omitted) (holding "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"). Most recently,

the United States Supreme Court in *Metro. Life Ins. Co. v. Glenn*, resolved any debate relative to

its finding in *Firestone* by holding that the conflict of interest created by a plan administrator's

dual role is "but one factor among many that a reviewing judge must take into account." *Metro.*

*Life Ins. Co. v. Glenn*, ____ U.S. ____, 128 S. Ct. 2343, 2351, 171 L. Ed.2d 299 (2008).  That is

to say, "when judges review the lawfulness of benefit denials, they will often take account of

several different considerations of which a conflict of interest is one." *Id.*   Nevertheless, such a

conflict does not necessitate that a court "create special burden-of-proof rules, or other special

procedural or evidentiary rules" focused on the party with the apparent conflict of interest when

other rules or standards are applicable.  *Id.*

## IV.   ANALYSIS AND DISCUSSION

### A.   The Plaintiffs' Claim for Enforcement of the Plan ("Denial of Benefits") Under ERISA § 502(a)(1)(B)

#### 1.   Applicable Statute of Limitations

As an initial matter, the defendants argue that the plaintiffs' § 502(a)(1)(B) claim is

barred by the applicable statute of limitations.  "ERISA does not provide a statute of limitations

for a section 502(a)(1)(B) claim to enforce plan rights."  *Hogan v. Kraft Foods*, 969 F.2d 142,

145 (5th Cir. 1992) (citing 29 U.S.C. § 1132).  Thus, "the state statute of limitations most

analogous to the cause of action" advanced must be applied.  *Hogan*, 969 F.2d at 145.  Claims

brought pursuant to § 502(a) "sound in contract, and are governed by the applicable state statute

of limitations for breach of contract actions."  S*t. Julian v. Trustees of Agreement of Trust for*

*Maritime Ass'n-I.L.A. Pension Plan*, 5 F. Supp.2d 469, 472 (S.D. Tex. 1998) (citing *Hogan*, 969

F.2d at 145; TEX. CIV. PROC. & REM. CODE ANN. § 16.004 (Vernon 1986) (other citation

omitted)).  In Texas, the statute of limitations applicable to breach of contract actions is four

years.  *Id.*; *see also Stahl v. Exxon Corp.*, 212 F. Supp.2d 657, 666 (S.D. Texas 2002).  The Fifth

Circuit has held that for purposes of ERISA a "cause of action accrues when a request for benefits is denied." *Hogan v. Kraft Foods*, 969 F.2d at 145 (citing *Paris v. Profit Sharing Plan for Emps. of Howard B. Wolf, Inc.*, 637 F.2d 357, 361 (5th Cir.), *cert. denied*, 454 U.S. 836, 102 S. Ct. 140, 70 L. Ed.2d 117 (1981)).   Nevertheless, while acknowledging that "[o]ther circuits have recognized that 'an ERISA beneficiary [or participant's] cause of action [can] accrue[] before a formal denial, and even before a claim for benefits is filed, 'when there has been a repudiation by the fiduciary which is *clear* and made known to the beneficiar[y] [or participant],'" it reasoned that "[t]he proposition that ERISA claims accrue when benefits are denied cannot be a one-size-fits-all rule, irrespective of the facts."   *Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 455 (5th Cir. 2006) (Owen, J., dissenting) (emphasis in original) (internal citations omitted).

The facts presented at trial demonstrate that the plaintiffs' claim for enforcement of the Plans and/or denial of benefits in this case accrued no earlier than February 21, 2003, the date on which the plaintiffs first became aware of the defendants' actions to increase their premiums, and no later than April 30, 2008, the date on which the Committee denied their claim for benefits. (Docket Entry No. 152, Trial Tr. at 171; *see also* Pls.' Tr. Ex. 142).   Thus, under either scenario, the Court concludes that the plaintiffs' claim for enforcement of the Plans and/or denial of benefits is timely, as they filed the instant action on February 16, 2007, within four years of the date they knew or should have known of the defendants' purported repudiation and/or breach.

## 2.    The Plaintiffs' Claim for Denial of Benefits Under ERISA § 502(a)(1)(B)

The plaintiffs contend that the Committee abused its discretion in denying their claim by acting in an arbitrary and capricious manner.   First, they maintain that because the APA amended the Plan and/or was integrated into the Plan, it remained unaffected by the defendants' improper

rejection of it under 11 U.S.C § 365 rather than 11 U.S.C § 1114. Second, they assert that § 5.05(f) of the APA, standing alone, includes all the necessary requirements to qualify as an ERISA plan. Third, the plaintiffs argue that the defendants' failure to give adequate notice of their rejection of the APA prevents "any legally binding modification of the plaintiffs' retirement benefits." Finally, the plaintiffs aver that the Sterling entities' Joint Plan of Reorganization and confirmation order resulted in § 5.05(f) of the APA surviving bankruptcy as a premium benefit expressly "assumed" by the bankruptcy court's confirmation order.

The defendants, on the other hand, maintain that the Committee did not abuse its discretion in denying the plaintiffs' claim and its decision is entitled to deference. They maintain that § 5.05(f) of the APA does not constitute an amendment to the Plan, but rather a contractual limitation on Sterling Fibers that was rejected during bankruptcy. They also contend that § 5.05(f) of the APA, standing alone, is insufficient to qualify as an ERISA plan. They assert that the Sterling entities gave "due and adequate notice" of their bankruptcy proceedings to the plaintiffs in compliance with due process requirements. Finally, the defendants argue that § 5.05(f) of the APA was properly rejected by the Sterling entities during their bankruptcy, the rejection was approved by the bankruptcy court and none of the plaintiffs sought to either invoke the procedures contained in § 1114 or file a claim for rejection damages. As such, the defendants contend that the plaintiffs' failure to raise their claim in the bankruptcy court waives their right to now assert a claim for failure to comply with bankruptcy procedures. The Court will address each of these arguments in turn.

### (a)      Whether the APA Amended the Plan?

The plaintiffs argue that the APA acted as an amendment to the Plan that vested in them post-retirement benefits and provided special rights to the them and other class members.[8]  They aver that the fact that § 5.05(f) of the APA neither mentioned nor referenced the Plan is irrelevant as neither ERISA, the Plan nor the Summary Plan Descriptions ("SPDs") mandate that such a label be imposed.  They further contend that the defendants' actions subsequent to the execution of the APA served to ratify the amendment contained in the APA.  They maintain that the Committee and Sterling's Human Resources Department recognized § 5.05(f) of the APA in various written documents and meetings, without contesting its legitimacy or the validity of its limitations.   Further, they contend that the defendants implemented the special pricing protections for them and other class members in a manner entirely consistent with a plan amendment.  As support for their contentions, the plaintiffs primarily rely on the Fifth Circuit's decision in *Halliburton Co. Benefits Comm. v. Graves*, 463 F.3d 360 (5th Cir. 2006) and the language contained in § 5.05(f) of the APA.

The defendants contend that the APA did not constitute an amendment to the Plan, but rather a contractual limitation on their ability to increase premiums without first conferring with Cytec.  They assert that both the purpose and language of § 5.05(f) of the APA indicate that it is a contractual obligation.  They also argue that there is no extrinsic evidence indicating that § 5.05(f) of the APA constituted a plan amendment.  To this end, they aver that the testimony of relevant witnesses, particularly Richard Crump, Kenneth Hale, David Elkins and Carol Van Rensalier, indicates that there was no intent to amend the Plan during Sterling and Cytec's

---

[8] The plaintiffs also appear to argue that they were "vested" in certain retiree medical benefits by way of § 5.05(f) of the APA.  To the extent that the plaintiffs intend to argue such, the Court determines that the language contained in § 5.05(f) does not create or give rise to any "vested" rights.  The evidence tendered at trial supports this position. Notwithstanding the aforementioned, this finding is merely ancillary and is not essential to the issues to be decided by this Court.

negotiations relative to the APA.  They further aver that Cytec did not consider § 5.05(f) of the APA to constitute a plan amendment and merely requested that the provision be included in the APA due to a similar obligation it had with American Cyanamid, its parent company.  Finally, they maintain that the plaintiffs did not review or rely upon § 5.05(f) of the APA at or about the time they joined Sterling Fibers in order to determine their rights under the Plan.  This Court agrees.

Under ERISA, "[e]mployers or other plan sponsors are generally free . . ., for any reason at any time, to adopt, modify, or terminate welfare plans."  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S. Ct. 1223, 1228, 131 L. Ed.2d 94 (1995) (citation omitted).  Nevertheless, ERISA still necessitates that employers or plan sponsors meet specific procedural standards when they seek to adopt, modify or terminate a qualifying plan.  *Id.* at 82 – 32, 115 S. Ct. at 1230.  Particularly, it requires that every employee benefit plan "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3).  In addition, an employee benefit plan must be "established and maintained pursuant to a written instrument . . . [that] provide[s] for one or more named fiduciaries who jointly or severally . . . have [the] authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).  "In the words of the key congressional report, '[a] written plan is to be required in order that every employee may, *on examining the plan documents*, determine exactly what his rights and obligations are under the plan.'" *Curtiss-Wright*, 514 U.S. at 83, 115 S. Ct. at 1230 (citing H. R. Rep. No. 93-1280, at 297 (1974), U.S.C.C.A.N. pp. 4639, 5077, 5078) (emphasis added)).

While the *Halliburton* case does support the proposition that a welfare benefit plan may be amended by a document not labeled as such, the language contained in the document at issue

in that case clearly conveyed the parties' intent to affect such an amendment. The same is not true in the case *sub judice*. The *Halliburton* case involved an attempt by Halliburton to reduce benefits to certain retirees without reducing benefits of other active retirees following a merger, expressly requiring this contractual commitment as a concomitant condition. *Halliburton*, 463 F.3d at 378. In *Halliburton*, two corporations, Dresser Industries, Inc., and Halliburton N.C., Inc., merged forming a new corporation, with Dresser remaining as the surviving corporation. *Id.* at 363. Prior to the merger, Dresser and Halliburton, N.C., each maintained separate welfare benefit plans for their employees and retirees. *Id.* The Dresser Retirement Medical Program, which was governed by Dresser's Plan 750, provided medical benefits that were significantly greater than the Halliburton Plan. *Id.* After the merger, the Halliburton Plan and the Dresser Plan 750 continued to be separately maintained. *Id.* at 365. Less than a year after the merger, however, Halliburton began to amend the Dresser Plan 750, and eventually, Halliburton combined the two plans and renamed the plan the Halliburton Energy Services, Inc. Welfare Benefits Plan ("HESI Plan"). *Id.* at 367.

Thereafter, the Halliburton Benefits Committee brought a declaratory action in federal district court against participants in the Dresser Retiree Medical Program asserting, *inter alia*, that the amendments were permissible and that the merger agreement did not limit Halliburton's right to amend or terminate the Dresser Retiree Medical Program. *Id.* at 368. On appeal, the Fifth Circuit, while addressing the effects of the merger agreement on the Dresser Retiree Medical Program, reasoned that despite the existence of a reservation-of-rights provision contained in the Dresser Plan 750, Halliburton could not unilaterally strip certain retired employees of their benefits because it had "bargained away" its right to do so when it and Dresser negotiated the terms of their merger agreement and incorporated certain conditions

specifically directed at the Dresser Retiree Medical Program.  *Id.* at 373 – 78.  The Fifth Circuit subsequently clarified its position in *Halliburton* by stating:  "we clarify that [our] decision results from and is limited to the specific language used in the corporate documents involved in the Halliburton-Dresser merger."  *Halliburton Co. Benefits Comm. v. Graves*, 479 F.3d 360, 361 (5th Cir. 2007) (per curiam denial of pet. for reh'g).  It further explained that "[b]ecause section 7.09(g)(i) [of the merger agreement] condition[ed] the rights of the participants under the Dresser [R]etiree [M]edical [P]lan on Halliburton's maintenance of benefits for similarly situated active employees, it [gave] the plan sponsor the ability to amend or terminate the plan, [but such amendments had to be] consistent with the condition."  *Id.* at 361 – 62.

The instant case involves a Plan that contains a reservation-of-rights, expressly granting Sterling the right to amend, modify or terminate the terms of its Plan at any time, under entirely different circumstances.  Here, the plaintiffs have presented no evidence establishing that by way of § 5.05(f) Sterling ceded or "bargained away" its right to modify or terminate its Plan or that it expressly agreed to assume Cytec's retiree medical benefits plan as its own.  The plain language of § 5.05(f) of the APA does not require that Sterling forgo the rights reserved to it in its Plan, but merely requires that Sterling Fibers provide postretirement medical and life insurance benefits to Acquired Employees that are "no less favorable" than those benefits provided by Cytec's plan.  (Pls.' Trial Ex. 4 at Sterling 1683 - 84.)  It also does not require that Sterling's Plan be the instrument for providing such benefits.  (*Id.*)  Nor does it prohibit Sterling from reducing retiree benefits or increasing premiums, but rather requires that it acquire Cytec's consent prior to doing so.  (*Id.*)  Accordingly, unlike in *Halliburton*, this Court finds that there is no language inherent in § 5.05(f) of the APA that clearly purports to amend the Plan.

The evidence presented at trial also supports this interpretation.  First, Evans, the only plaintiff to testify at trial, acknowledged that Sterling Fibers did not adopt or assume Cytec's retiree medical plan by way of the language contained in § 5.05(f) of the APA.  (Docket Entry No. 152, Trial Tr. at 143).  He also acknowledged during trial that Sterling's Plan, much like Cytec's Plan, contained language reserving its right to amend, terminate or modify its Plan.  (*Id.*, Trial Tr. at 123 – 125.)  As support for his contention that § 5.05(f) of the APA constitutes a Plan amendment, Evans relies entirely on the language contained in § 5.05(f) of the APA, Cytec's retiree medical benefit plan and the language of the Plan.  (*Id.*, Trial Tr. at 141 - 43).  Second, Cytec's own representative, Carol Van Rensalier, testified during her deposition that Cytec requested that § 5.05(f) of the APA be incorporated in the parties' agreement based on a similar contractual obligation between it and American Cyanamid, its parent company.[9]  (*See* Van Rensalier Depo. at 12 – 15; 73 – 74; 106; 144 – 45; *see also* Pls.' Trial Exs. 18, 19, 21.)  She further indicated that Cytec viewed the provision as a contractual obligation between it and Sterling Fibers rather than a Plan amendment. (*Id.*)  Third, the individuals who either contributed to or directly participated in the negotiation of the APA, namely Kenneth Hale ("Hale"), Sterling's General Counsel, Chairman of its Committee and former outside counsel, Richard Crump ("Crump"), Sterling's former President and CEO, Robert McAlister ("McAlister"), Sterling's Former Vice President of Human Resources, and David Elkins ("Elkins"), Sterling's former outside counsel and subsequent General Counsel, President and CEO, testified that there was no intention and/or discussion that § 5.05(f) of the APA would or should constitute an amendment to the Plan.  (*See* Docket Entry No. 156, Trial Tr. at 28, 69, 83, 165 – 66; *see also* McAlister Depo. at 23 – 24, 59, 82; Elkins Depo. at 9 – 10; 81 – 82.)

---

[9] The testimony of certain witnesses, otherwise unavailable for trial, was offered into evidence through deposition transcripts.

Moreover, the original Plan documents—which designated the Committee as Plan administrator and Sterling as Plan sponsor—support this interpretation, as the Plan remained in place and in effect prior to and subsequent to the acquisition and does not refer to or incorporate the terms of § 5.05(f) of the APA. The evidence establishes that Sterling adopted formal plan documents for its retiree medical and drug plans in 1996, namely its Medical Benefits Plan and Prescription Benefits Plan. These documents, along with its summary plan descriptions, ("SPDs"), jointly comprise its Plan. (Docket Entry No. 156, Trial Tr. at 40, 89 – 90; *see also* Pls.' Trial Ex. 5, 6, 39, 56, 63; Defs. Trial Ex. 215). In addition, all Plan documents, including the SPDs, contain a reservation-of-rights provision permitting the Committee, as Plan administrator, the right to amend, modify or terminate the Plan at any time as well as procedures for making claims under the Plan. (Pls.'s Trial Exs. 5 at 2; 6 at 2; 38 at 17 – 18; 39 at 17, 20 -21; 56 at 16; 63 at 32; *see also* Defs.' Trial Ex. 215 at 17, 20 – 21). Neither the Plan nor the SPDs, however, delineate any particular steps that must be followed to effectuate an amendment or termination other than to specifically confer the right to make such amendments on the Plan administrator.

Sterling's Plan also addresses various areas of benefits and coverage, including "medical expense contributions" and explicitly provides that "[c]ontributions shall be required for coverage, shall be determined by the Employer and may change periodically." (Pls.' Trial Ex. 5 at 6). Its SPD issued in January of 1997, prior to the closing of the acquisition, provides, in pertinent part, as follows:

> You and the Company share in the cost of this Plan. A schedule of current contribution rates is available from the Human Resources Department.
>
> Contribution rates are different for retirees over age 65 than for retirees under age 65. Retiree contribution rates may fluctuate up or down and **will** **not** stay constant after your retirement.

19 / 46

(Pls.' Trial Ex. 56 at 5).  Sterling's first SPD issued immediately after the acquisition, dated February 1997, includes a provision permitting former Cytec employees the ability to participate in the Plan upon their retirement.  (Pls.' Trial Ex. 63 at 29).  It also references contribution rates by providing that:  "[c]ontribution rates can be obtained from the Employee Resources Department."  (*Id.*)  Nevertheless, it includes no reference to § 5.05(f) of the APA or the obligations contained therein.

Further, Hale's trial testimony is also consistent with this interpretation.  At trial, Hale testified that the defendants amended certain provisions of their Plan by revising their SPDs and sending the revised SPDs to participants and retirees, usually in correlation with the annual enrollment process.  (*See* Docket Entry No. 156, Trial Tr. at 89 – 90).  He testified that while Sterling's Plan is more general and overriding in scope, its SPDs, tended to be more detailed with regard to "what the coverage is, how the coverage works" and what is being offered for that particular year, essentially.  (*Id.* at 90).  As such, he stated that any amendments or modifications to Sterling's Plan would typically be made in the SPDs and would, thereafter, be distributed to Plan participants.  (*Id.*)  He indicated that § 5.05(f) of the APA was never distributed to Plan participants and that the language contained in it was never included in the Plan.  (*Id.*)  He further stated that § 5.05(f) of the APA was presented to Sterling as a non-negotiable provision in order to ensure that Cytec complied with a separate contractual obligation it had with its parent company, American Cyanamid.  (*Id.* at 26, 81 – 83.)  As previously stated, Cytec's representative, Van Rensalier, confirms Hale's testimony in this regard.  (*See* Van Rensalier Depo. at 12 – 15; 73 – 74; 106; 144 – 45; *see also* Pls.' Trial Exs. 18, 19, 21.)

In short, the Court concludes that the evidence in the record suggests that the APA was not a Plan amendment, but rather a contractual obligation.[10]  This finding is premised on the plain language contained in § 5.05(f) of the APA as well as Cytec's underlying purpose in requiring the inclusion of this "non-negotiated" provision in the APA.  This conclusion is further bolstered by the fact that § 5.05(f) does not mention, incorporate, refer to or state that it is intended as an amendment of the Plan or that the Plan should be the mechanism for providing the conditions set forth therein.  Finally, there is no indication that § 5.05(f) of the APA was executed and/or adopted in accordance with Plan procedures.  The fact that Sterling's Board of Directors ultimately voted to approve the APA, the actual contract that documents Sterling Fibers' acquisition of Cytec's acrylic fibers business, does not change this Court's conclusion. Indeed, the evidence contained in the record and reproduced at trial makes evident that retiree contribution rates were not intended to remain unaltered and that Sterling's management reserved the right to set such rates, thereby requiring participants and beneficiaries to consult with Sterling's Human Resources Department to determine their respective contribution rate amounts.

The Court holds in the alternative that, even assuming *arguendo* that § 5.05(f) of the APA amended the Plan as the plaintiffs insinuate, the contractual limitation imposed by this section was removed once the Sterling entities rejected the APA during their bankruptcy proceeding and decided to increase premiums thereafter.

---

[10] This Court previously reasoned, in its order denying the defendants' motion to dismiss, that based on the decision in *Halliburton*, the APA did amend the Plan.  (*See* Docket Entry No. 22).  This ruling, however, was premised on the limited record before the Court, which did not include Plan documents and other relevant evidence, as well as the standard applicable on a motion to dismiss.  After a thorough examination of all applicable Plan documents, testimony and other relevant evidence contained in the record, the Court finds the converse and determines the *Halliburton* case to be wholly distinguishable from the case at bar.

**(b)      Whether § 5.05(f) of the APA is an ERISA Plan?**

Additionally, the plaintiffs argue that § 5.05(f) of the APA, standing alone, is an ERISA plan.  In order to determine whether an employee benefit arrangement qualifies as a plan, a court must ascertain "whether a plan:  (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA 'employee benefit plan'-establish[ed] or maintain[ed] by an employer intending to benefit employees." *Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir. 1993); *see also Shearer v. Sw. Serv. Life Ins. Co.*, 516 F.3d 276, 279 (5th Cir. 2008).  "If any part of the inquiry is answered in the negative, the submission is not an ERISA plan."  *Meredith*, 980 F.2d at 355.

In ascertaining whether a plan exists under the first prong of the test, "a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing and procedures for receiving benefits." *Meredith*, 980 F.2d at 355.  The parties in this case do not generally dispute the existence of an employee welfare benefit plan, rather the plaintiffs appear to suggest that, when examined independently, § 5.05 (f) of the APA is itself a benefit plan.  This Court does not agree.

First, a reasonable person could not ascertain from a review of § 5.05(f) sufficient information concerning the specific welfare benefits made available, all beneficiaries covered, the source of financing or the procedures for acquiring such benefits.  Without a doubt, other documents must be referenced in order to ascertain such information.  Second, the evidence presented at trial demonstrates that § 5.05 (f) was incorporated into the APA not at Sterling's insistence so as to benefit its employees, but rather at Cytec's persistence so that it could comply with a contractual commitment it owed to American Cyanamid, its parent company.  (*See* Docket Entry No. 156, Trial Tr. at 25 – 26, 82; Pls.' Trial Exs. 18, 19, 21; Defs.' Trial Ex. 90; Depo. of

Carol Van Rensalier at 106:7 - 21.)  Having resolved two parts of the aforementioned inquiry in the negative, this Court need not consider whether § 5.05(f) of the APA "falls within the safe-harbor provision established by the Department of Labor" before determining that § 5.05(f) of the APA, by itself, is not an ERISA plan.

**(c)      Whether Sterling Gave the Requisite Notice of Their Rejection of the APA During Their Bankruptcy Proceeding?**

Next, the plaintiffs maintain that the defendants' failure to give them adequate notice of their rejection of the APA prevents "any legally binding modification of the plaintiffs' retirement benefits.[11]"  This Court disagrees.  The evidence presented at trial establishes that not only were the plaintiffs personally notified of the Sterling entities' commencement of bankruptcy proceedings by Sterling's Chairman, Frank Diassi, but they also received notice of the bankruptcy filing directly from the bankruptcy court, along with copies of proof of claim forms and applicable bar date notices.  (Docket Entry No. 152, Trial Tr. at 147; Pls.' Trial Ex. 27).  The evidence also establishes that Evans, in particular:  (1) received notice of the first-day hearing and filings to be considered by the bankruptcy court during the Sterling entities' bankruptcy case; (2) was asked, in his capacity as Managing Director of Engineered Fibers Technology ("EFT"), to participate on the creditors' committee; (3) declined to participate on the creditors' committee, but requested that EFT be retained on the service list so that he and/or it could receive notice of the bankruptcy events; and (4) voted, by way of EFT's Manager of Operations, John Rizos, to confirm the Joint Plan of Reorganization.  (*See* Docket Entry No. 152, Trial Tr. at 147 – 53, 162; Defs.' Trial Exs. 203 – 205, 209).

---

[11] In their post-trial reply brief as well as their letter brief dated April 15, 2010, the plaintiffs assert that they are not complaining about "the failure to give notice of a motion to reject the APA" but rather about "affirmatively misleading assurances."  (Docket Entry Nos. 164 at 9; 166 at 2).  To this end, they contend that "[w]hen a debtor misleads a claimant, even if it does not act in bad faith, 'perfunctory knowledge of the bankruptcy proceeding [does] not constitute adequate notice to satisfy constitutional due process requirements.'"  Because this Court determines that the evidence presented does not establish that the defendants misled the plaintiffs during the pendency of their bankruptcy proceeding, the plaintiffs' notice claim in this regard is rejected as meritless.

The evidence further establishes that the Sterling entities gave notice of their bankruptcy filing as well as their motion to reject the APA to Cytec, their counterparty to the APA. (*See* Pls.' Trial Ex. 34).   Finally, the defendants notified the plaintiffs, on December 9, 2002, prior to the Sterling entities' discharge from bankruptcy, that their premiums and benefits were only guaranteed through March 31, 2003, and that no decision had been made concerning their retiree medical benefits and premiums for April 1, 2003.   (Docket Entry No. 156, Trial Tr. at 115; *see also* Pls.' Trial Exs. 33, 41 – 43).   Thereafter on February 21, 2003, the defendants notified the plaintiffs that their premiums would be increased effective April 1, 2003.   Hence, the plaintiffs became aware of the defendants' intent to increase their premiums within the 180-day time period applicable to parties in interest seeking revocation of a bankruptcy confirmation order alleged to have been procured by fraud.  *See* 11 U.S.C. § 1330(a).

While the Due Process Clause does impose certain notice obligations on defendant debtors who commence bankruptcy proceedings and seek to reject and/or assume executory contracts, this Court, after an examination of the entire record before it, finds no indication that due process requirements were not met in the Sterling entities' underlying bankruptcy case so as to prevent the defendants from relying on their rejection of the APA.   *See* FED. R. BANKR. P. 6006(c).   "Due process [merely] requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"   *United Student Aid Funds, Inc. v. Espinosa*, ___ U.S. ___, 130 S. Ct. 1367, 1378, 176 L. Ed.2d 158 (2010) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950)); *see also In re Christopher*, 28 F.3d 512, 519 (5th Cir. 1994) (citing *In re Sam*, 894 F.2d 778, 782 (5th Cir. 1990)).   It does

not demand actual notice.  *See Jones v. Flowers*, 547 U.S. 220, 225, 126 S. Ct. 1708, 164 L. Ed.2d 415 (2006).

The evidence in this case demonstrates that prior to the Sterling entities' Joint Plan of Reorganization being confirmed in November of 2002, the plaintiffs received actual notice of Sterling's bankruptcy action, their Joint Plan of Reorganization, its contents and confirmation. Although they may not have received formal notice of a number of other important dates relative to the Sterling entities' bankruptcy proceedings, they were notified of the Sterling entities' bankruptcy by way of Diassi's letter to them dated July 16, 2001, and their receipt of proof of claim forms and applicable bar date notices.  A reasonable assumption can also be made that Evans, in his capacity as Managing Director of EFT, continued to receive updates on various bankruptcy events due to his request that EFT be retained on the bankruptcy court's service list. Moreover, the bankruptcy court, in its order granting the defendants' motion authorizing rejection, specifically found that the Sterling entities had provided "due and adequate notice" with respect to their motion seeking rejection of the APA.  (*See* Pl.'s Trial Ex. 35).  Further, in its order confirming the Sterling entities' Joint Plan of Reorganization, the bankruptcy court specifically found and determined that "supplemental notice of the Confirmation Hearing [had been] provided by publication as required by the Solicitation Order" and that "[a]dequate and sufficient notice of the Confirmation Hearing and other deadlines and matters required to be noticed pursuant to the Solicitation Order [had been] given in compliance with the Bankruptcy Rules."  (Pl.'s Trial Ex. 37).

Indeed, there is no doubt that the plaintiffs had notice sufficient to apprise them of the Sterling entities' bankruptcy proceedings.  This notice was also sufficient to allow them time to present their objections to the Sterling entities' Joint Plan of Reorganization and confirmation,

especially in light of the fact that the bankruptcy case was not closed until December 29, 2005.[12] (*See* Defs.' Trial Ex. 227).  The Fifth Circuit has held that if a creditor receives actual notice of the debtor's bankruptcy, due process is satisfied and the creditor is confined by the terms of any confirmed plan of reorganization.  *See In re Christopher*, 28 F.3d at 517 - 18.  Thus, the plaintiffs' attempt to now challenge the notice provided by the Sterling entities' relative to their motion seeking rejection of the APA, Joint Plan of Reorganization and/or confirmation is rejected by this Court as untimely and improper.

### (d) The Effect of the Rejection of the APA During Bankruptcy.

The plaintiffs further suggests that the Sterling entities' rejection of the APA was unsuccessful in eliminating the restriction on increasing premiums imposed by § 5.05(f) because they failed to comply with 11 U.S.C. § 1114.  (*See* Docket Entry No. 162 at 13.).  They maintain that the Sterling entities' general rejection of the APA during their bankruptcy proceedings, pursuant to 11 U.S.C. § 365, did not reject the specific provisions of § 5.05(f) of the APA, which constitute "retiree benefits."  (*Id.*)  They further argue that § 5.05(f) of the APA constitutes a premium benefit that equates to a "retiree benefit" within the meaning of § 1114 and was "assumed" by the bankruptcy court's confirmation order.

In contrast, the defendants argue that the Sterling entities' were not required to comply with the procedures enumerated in § 1114 during their bankruptcy because they did not modify "retiree benefits" as the term is defined within the meaning of § 1114.  (*See* Docket Entry No. 161 at 16 - 18.).  They maintain that because they continued to pay all claims under the Plan during the bankruptcy and did not increase premiums until after emerging from bankruptcy, they never modified "retiree benefits" during the bankruptcy such that they would have to comply

---

[12] The bankruptcy case was reopened again in 2006, in an attempt to resolve a disputed claim and eventually closed in January of 2007.  (*See* Docket Entry No. 153, Trial Tr. at 349).

with the procedures contained in § 1114. (*Id.*). They also contend that § 1114 relief is unavailable after debtors, such as the Sterling entities, have emerged from bankruptcy. (*Id.* at 17). The defendants further contend that the plaintiffs' attempts to classify § 5.05(f) as a "benefit" requiring compliance with § 1114 in bankruptcy court is not supported by § 1114's legislative history. (*See* Docket Entry No. 163 at 8 – 9). The defendants aver that if § 5.05(f) of the APA is a contractual limitation, the Sterling entities' rejection of the APA under 11 U.S.C. § 365, eliminated the limitation and if it is a plan amendment, the rejection amended the plan to eradicate this provision. Finally, the defendants assert that the Sterling entities' properly rejected the APA under § 365, the bankruptcy court approved their rejection and no party ever objected, filed any claims for rejection damages or moved to invoke the procedures of § 1114 in the bankruptcy court. (*Id.* at 7.) Therefore, the defendants contend that the plaintiffs' failure to raise their claim in the bankruptcy court waives their right to assert a claim for failure to comply with bankruptcy procedures in this Court.

At trial, both parties presented expert testimony concerning bankruptcy practice in Chapter 11 cases and the applicability of 11 U.S.C. § 1114 to the Sterling entities' bankruptcy proceedings. Catherine Steege, the plaintiffs' expert witness, suggested that the plain language and purpose of § 1114 substantiates that § 5.05 (f) is a "retiree benefit" within the meaning of § 1114. (*See* Docket Entry No. 153, Trial Tr. at 219 – 20, 234 - 35.) She testified that for purposes of § 1114, "retiree benefits" includes not only "payment to an entity or person . . . for medical, surgical, or hospital care benefits" but also "benefits in the event of sickness, accident, disability or death [under any plan, fund or program.]" (*Id.* at 241 - 42). She reasoned that § 1114 is broad in scope and does not simply cover "payments." (*Id.*) She testified that § 1114 should be construed broadly and read to include the following:

It is everything that is involved with a medical program for retirees.  It is not just what the doctors are entitled to receive if they take case of the retiree or what the cost of the drugs might be under a prescription drug plan.  It is everything that goes into what, you know, people commonly refer to as medical insurance.  It is what you have to pay for it.  It is how that cost is calculated.  It is the benefits that you receive.  It's your right to those benefits over what period of time and whether you are eligible for them and whether it covers your dependents, spouses; what happens, you know, when you, you know, advance out of—you know, pre-Medicare and post-Medicare.  It is just everything related to all of that.

(*Id.*)

Steege also testified that the Sterling entities rejected only those provisions of the APA that were executory at the time that they presented their rejection motion to the bankruptcy court. (*Id.* at 285).  To this end, she stated that § 5.05(f) was not executory at the time that the Sterling entities presented their motion to the bankruptcy court because there was nothing left to reject under that section.  (*Id.*)  She further explained that the Sterling entities "had taken Section 5.05(f) when they acquired the employees and that became what [their] retiree medical program was.  [Though], there were ongoing conditions as part of that retiree medical program; . . . they weren't capable of being rejected by rejecting the APA."  (*Id.* at 286).

Tellingly, however, she also testified that once a debtor emerges from bankruptcy, relief under § 1114 is not available.  (*See* Docket Entry No. 153, Trial Tr. at 282).  She reported that the court in *In re Farmland Indus.*, 294 B.R. 903, 921 n.19 (Bankr. W.D. Mo. 2003), "noted that once a plan is confirmed and the debtor emerges from bankruptcy, it would be freed from the constraints of Section 1114 and entitled to take any action that federal law would allow it to take with respect to retiree benefits."  (*Id.* at 283).  She acknowledged her awareness of a line of cases, namely *In re Doskocil Companies, Inc.*, 130 B.R. 870 (Bankr. D. Kan. 1991) and *In re Chateaugay Corp.*, 111 B.R. 399 (S.D. N.Y. 1990), permitting debtors the right to amend retiree medical benefits if they retain the right to amend or terminate the plans at any time. (*Id.* at 296 -

298).   Steege further conceded that there is a procedure contained in § 1114 for opposing a rejection during bankruptcy premised on grounds within its provisions and that the plaintiffs failed to invoke this procedure.[13]   (*Id.* at 294 - 96).

In contrast, Michael H. Reed, the defendants' expert, testified that the Sterling entities were not required to comply with the procedures contained in § 1114 during their bankruptcy because they did not modify "retiree benefits" as the term is defined within the meaning of § 1114.   (*See* Docket Entry No. 153, Trial Tr. at 334 – 336.)   He testified that based on the plain meaning as well as case law interpreting § 1114, the term "retiree benefits" as defined in § 1114(a), "refers to payments" and "everything that comes after it is really appositive to and an elaboration on payments in that section."   (*Id.* at 334).   He stated that § 1114, "on its face, does not prevent a change in benefit design or terms that would not take effect until after the bankruptcy."   (*Id.* at 344.)   Instead, he reasoned that "what Section 1114 interdicts is unilateral changes in payments during [a bankruptcy] case.   It does not . . . prevent a debtor from making changes after the bankruptcy case is over."   (*Id.*)

He further testified that the Sterling entities were not required to give any sort of notice to the bankruptcy court that there was a possibility that § 1114 could be implicated by their rejection of the APA, namely § 5.05(f).   (*Id.* at 340)   He stated that under the business judgment standard, the legal standard applicable to the rejection of executory contracts, "there is no obligation that a debtor explain the potential negative consequences that a rejection of a contract

---

[13] 11 U.S.C. § 1114(d) provides as follows:

> The court, upon a motion by any party in interest, and after notice and a hearing, shall order the appointment of a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement.  The United States trustee shall appoint any such committee.

will have upon the non-debtor parties or third-parties to a contract because the primary concern is "what will be the benefit to the estate." (*Id.* at 341 - 42). Finally, he stated that in February of 2003, after the plaintiffs had been notified that the defendants intended to increase their premiums effective April, the plaintiffs could have sought some form of relief in the bankruptcy court, as the court retained broad jurisdiction over disputed matters relating to executory contracts relative to the estate. (*Id.* at 348). The Court finds Reeds testimony in this regard credible and supported by the evidence.

Moreover, additional evidence presented at trial established that the Sterling entities sought to reject certain miscellaneous executory agreements, including the APA, pursuant to 11 U.S.C. § 365 on October 18, 2002. (*See* Pls.' Trial Ex. 34). Pursuant to an Order dated November 13, 2002, the bankruptcy court approved the Sterling entities' rejection of certain miscellaneous executory agreements, including the APA as of October 18, 2002, and further stated that "any claims for rejection damages arising from the rejection of the Miscellaneous Executory Agreements (as defined in the Motion) must be asserted against the Debtors no later than twenty (20) days after entry of this order granting this Motion *or else they [would] be forever barred.*" (*See* Pl.'s Trial Ex. 35) (emphasis added). No party in interest, however, ever objected or filed any claims for rejection damages. Thus, in accordance with the bankruptcy court's order, the APA was rejected as a whole as of October 18, 2002, as it is well-settled law that under § 365, "an executory contract [can only be] assumed or rejected in its entirety." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citation omitted) (emphasis added); *see also* Docket Entry No. 153, Trial Tr. at 289, 337 -38). "Where, [as here] an executory contract contains several agreements, the debtor may not choose

to reject some agreements within the contract and not others."  *Stewart Title Guar.*, 83 F.3d at 741 (citation omitted).

Other evidence admitted during the course of the trial demonstrated that on October 15, 2002, the Sterling entities filed their Joint Plan of Reorganization.  Specifically, in Section 7.5 of their Joint Plan of Reorganization, the primary provision relative to employee benefit and compensation matters, the Sterling entities included, in relevant part, the following provision:

> *Except to the extent (a) previously assumed or rejected by an order of the Bankruptcy Court on or before the Confirmation Date, or (b) the subject of a pending motion to reject filed by a Debtor on or before the Effective Date*, all other employee compensation and benefit programs of the Debtors, including all pension plans and including all programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan.  All pension plans shall continue in effect on and after the Effective Date.  Nothing contained herein shall be deemed to modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtors' rights of termination thereunder.

(Pls.' Trial Ex. 36) (emphasis added).  Thus, they expressly exempted any obligations, programs and/or plans previously assumed or rejected by way of the bankruptcy court from their assumption of benefits subject to §§ 1114 and 1129(a)(13).  On November 20, 2002, the bankruptcy court entered an order confirming the Sterling entities' Joint Plan of Reorganization and further "finding and determining" in paragraph "CC" that "[a]ny retiree benefits within the meaning of 11 U.S.C. § 1114 will be treated as executory contracts and assumed pursuant to Section 7.5 of the Plan.  Thus, the requirements of 11 U.S.C. § 1129(a)(13)[14] are satisfied." (Pls.' Trial Ex. 37).  The plain language of the confirmation order does not somehow suggests

---

[14] 11 U.S.C. § 1129(a)(13) provides as follows:  "The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits."

that § 5.05(f) of the APA was "assumed" by the bankruptcy court's confirmation order, in spite of the Sterling's entities' rejection of the APA and their incorporation of such in Section 7.5 of their Joint Plan of Reorganization, as the plaintiffs insinuate.

Further, despite being given notice and an opportunity to be heard regarding the Joint Plan of Reorganization and confirmation, the plaintiffs failed to raise any objections or appeal any provisions of the Joint Plan of Reorganization prior to its confirmation. Their failure to act precludes their ability to raise such a challenge or collaterally attack the Joint Plan of Reorganization and/or confirmation order in this Court, especially in light of the bankruptcy court's retention of broad jurisdiction over matters arising out of the bankruptcy, specifically including "matters with respect to the assumption or rejection of any executory contract." (Pls.' Trial Ex. 36 at 29.) Any purported "error" in failing to comply with § 1114 does not affect the Sterling entities' rejection of the APA, as the order granting the rejection of the APA, the Joint Plan of Reorganization and the confirmation order are binding on the plaintiffs in this case. *See United Student Aid Funds*, *Inc. v. Espinosa*, ___ U.S. ___, 130 S. Ct. 1367, 1379, 176 L. Ed.2d 158 (2010) (reasoning that a bankruptcy court's legal error in failing to make an undue hardship finding in an adversary proceeding prior to confirming the debtor's discharge of student loan debt did not render its confirmation order void); *see also In re Flushing Hosp. and Med. Ctr.*, 395 B.R. 229, 244 (Bankr. E.D.N.Y. 2008) ("Confirmation orders are given *res judicata* effect, and may not be subject to collateral attack"); *In re Cross Media Mktg. Corp.*, 367 B.R. 435, 447 (Bankr. S.D.N.Y. 2007) ("It is well settled that a bankruptcy court's order confirming a chapter 11 plan is treated as a final judgment on the merits with full *res judicata* effect"). Hence, the plaintiffs' argument that the defendants' rejection of the APA was unsuccessful in eliminating the restriction on increasing premiums imposed by § 5.05(f) because the defendants

failed to comply with § 1114 is unavailing.  Likewise, their assertion that § 5.05(f) of the APA constitutes a premium benefit that equates to a "retiree benefit" within the meaning of § 1114 and was "assumed" by the bankruptcy court's confirmation order is also meritless and unsupported by the evidence tendered at trial.

**(e)     Whether the Committee Abused its Discretion?**

The evidence present at trial established the following:

(1).    On March 28, 2008, the plaintiffs filed their initial claim with the Committee, the plan administrator for the Plan, as well as evidence in support of their claim, which essentially consisted of their briefing and exhibits previously filed with this Court relative to their motion for partial summary judgment.  (Pl.'s Tr. Ex. 139);

(2).    On April 22, 2008, the defendants submitted their response to the plaintiffs' motion for summary judgment to the Committee. (Docket Entry No. 82, Ex. A.);

(3)     On April 30, 2008, the Committee issued its initial decision denying the plaintiffs' claim and further indicating the following findings:  (a) the APA did not amend the Plan; (b) Sterling Fiber's contractual obligation to Cytec pursuant to the APA was terminated when the APA was rejected in bankruptcy; and (c) the increase in premiums charged to Sterling Fibers' retirees in 2003 was permitted by the Plan. (Pls.' Tr. Ex. 142);

(4)     In its written denial, the Committee also explained the plaintiffs' rights to an appeal and set forth the procedures for pursuing an appeal.  (*Id.*);

(5)     On June 6, 2008, the plaintiffs' appealed the Committee's denial. (Pls.' Tr. Ex. 143).

(6)     On July 29, 2008, the plaintiffs and their attorneys appeared before the Committee and presented their evidence and arguments in support of their claim. (Pls.' Tr. Ex. 144).

(7)     On August 12, 1008, the Committee denied the plaintiffs' appeal and issued its final determination.  (*Id.*)

After reviewing the information contained in the administrative record and as well as the supplemental evidence presented at trial, the Court concludes that the Committee's decision is supported by substantial evidence and is not arbitrary or capricious.  The Committee's conflict of interest, although considered as a factor, does not alter this Court's conclusion.  Further, the plaintiffs have failed to tender evidence indicating that there is a greater likelihood that Sterling and/or the Committee's conflict of interest affected the Committee's decision to deny the plaintiffs' claim in light of the overwhelming evidence to the contrary contained in the record.  Therefore, the Court concludes that the defendants are entitled to judgment on the plaintiffs' individual and class claims for denial of benefits.

### B.      The Plaintiffs' Breach of Fiduciary Duty Claims

#### 1.        Applicable Statute of Limitations

Next, the plaintiffs assert that the defendants breached certain fiduciary duties imposed upon them by ERISA.  Specifically, they allege individual claims for breach of fiduciary duty pursuant to § 502(a)(2) and § 502(a)(3) against the defendants.  ERISA provides an express limitations period for actions commenced concerning "a fiduciary's breach of any responsibility, duty, or obligation" mandated by its provisions.  29 U.S.C. § 1113.  With respect to such actions, ERISA provides that the statute of limitations period shall commence "the *earlier* of . . . six years after . . . the date of the last action which constituted a part of the breach or violation, or . . . three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  *Id.* (emphasis added).  However, in cases where fraud or concealment is alleged, "such action may be commenced not later than six years after the date of discovery of such breach or violation."  *Id.*  "Under this statutory scheme, the limitations period for ERISA claims is generally six years, unless [the] defendants can show that the plaintiffs had actual knowledge

of alleged wrongdoing, in which case section 1113(2) extinguishes the claim after three years."
*Smith v. Prager*, 108 F.3d 333, 336 (5th Cir. 1997).  Here, the defendants do not dispute that the plaintiffs filed suit within the six-year limitations period; rather, they contend that the plaintiffs had actual knowledge of relevant facts in support of their claim as early as October 18, 2002, when the defendants sought to reject the APA, and no later than February 21, 2003, when the defendants informed them of their intent to increase premiums effective April 1, 2003.  The plaintiffs filed their lawsuit on February 16, 2007.

In order to ascertain whether the plaintiffs filed suit within the three-year limitations period, this Court must determine when the plaintiffs had "actual knowledge of the breach or violation."  *See* 29 U.S.C. § 1113(2).  The Fifth Circuit has held that "[a]ctual knowledge 'requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm.'"  *Reich v. Lancaster*, 55 F.3d 1034, 1057 (5th Cir. 1995) (quoting *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d. Cir. 1992) (citations omitted)).  "[A]ctual knowledge sufficient to trigger the three-year limitations period of section 1113(2) is a 'stringent requirement' and "section 1113 'sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six-year limitations period.'"  *Smith v. Prager*, 108 F.3d 333, 336 (5th Cir. 1997) (citing *Reich*, 55 F.3d at 1057).  Thus, "[a]ctual knowledge requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim for breach of fiduciary duty or violation under ERISA."  *Maher v. Strachan Shipping Co.,* 68 F.3d 951, 954 - 55 (5th Cir. 1995) (quoting *Int'l Union v. Murata Erie North America*, 980 F.2d 889, 900 (3d Cir. 1992)).

At trial, the evidence established that the defendants:  (1) sought to reject the APA on October 18, 2002 (*See* Pl.'s Trial Ex. 34); (2) notified the retirees and others, including the plaintiffs, on December 9, 2002, that although no final decision had been made as to what would happen to their premiums, their current premiums would only be guaranteed through March 31, 2003 (*See* Pls.' Trial Ex. 33); (3) pursuant to a letter dated February 21, 2003, notified the plaintiffs of their decision to increase premiums, effective April 1, 2003, for retirees in stages over a two-year period (*See* Pls.' Trial Exs. 41 – 43); and (4) on April 1, 2003, increased the premiums charged to Sterling Fibers' retirees to a level consistent with the premiums charged to all other participants under the Plans (*Id.*; *see also* Docket Entry No. 156, Trial Tr. at 163.)

Additionally, testimony elicited from Evans at trial established that he:  (1) received actual notice of the Sterling entities' bankruptcy action in July of 2001 as well as their emergence from reorganization on December 19, 2002 (*See* Docket Entry No. 152, Trial Tr. at 161 – 62; Pls.' Trial Ex. 30; Defs.' Exs. 77 - 79); (2) declined to participate on the creditors' committee, in his capacity as Managing Director of EFT, but requested that his company be retained on the service list so that he could be updated on the bankruptcy events (*See* Docket Entry No. 152, Trial Tr. at 150); (3) became aware, on or about February 21, 2003, of the defendants' intent to increase their medical premiums effective April 1, 2003 (*Id.*, Trial Tr. at 171); (4) on or about May 19, 2003, assisted Edward Battistelli in drafting a letter to Rebecca Hyzer, Sterling's Director of Compensation and Benefits, complaining of Sterling's proposed increase in premiums as well as its violation of the APA and requesting that such action be rescinded and all excess premiums paid since April 1, be reimbursed (*See* Pls.' Trial Ex. 47); (5) on or about June 3, 2003, received notice from Rebecca Hyzer that Sterling and the other defendants were maintaining the position that the APA had been formally rejected by them and

approved in the bankruptcy court and thus, they were permitted to increase premiums (*See* Docket Entry No. 152, Trial Tr. at 178.); (6) on or about May 5, 2003, wrote to Sterling and Cytec requesting reinstatement and/or immediate enrollment under their retiree medical benefits plans (*Id.*; *see also* Defs.' Trial Ex. 87); and (7) filed formal complaints with the United States Department of Labor as well as the Connecticut Department of Labor complaining of Sterling and Cytec's actions, namely Cytec's "denial . . . [of his request] to provide retiree medical benefits," Sterling's "elimination . . . of guaranteed retiree medical premiums through age 65 [in spite of an] agreed . . . contract," "discrimination to retirees, and possible collusion and ERISA violations, by both . . . companies."  (*Id.*, Trial Tr. at 179; *see also* Pls.' Trial Ex. 133).

Indeed, the plaintiffs' actions subsequent to their receipt of the defendants' letter dated February 21, 2003, evince actual knowledge of the facts giving rise to their breach of fiduciary duty causes of action.  Moreover, their letters of complaint to the defendants, Cytec and the Department of Labor further denote an acute awareness of the legal wrong they allege the defendants are liable for committing, making the instant action subject to the three-year limitations period and therefore, untimely.  Even more telling is the fact that Evans, in his formal complaint to the Department of Labor, expressly insinuated that Sterling and/or Cytec may liable for "possible collusion and *ERISA violations*."  (*Id.*) (emphasis added).

Further, this Court is not persuaded that the plaintiffs have satisfied the exception applicable to cases involving fraud or concealment.  The applicable provision in § 1113 provides "that in cases of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation."  29 U.S.C. § 1113.  "To establish fraudulent concealment a party must show that the alleged wrongdoer had both actual knowledge that a wrong had occurred and a fixed purpose to conceal the wrong from the injured party."

*Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992) (citing *Dotson v. Alamo Funeral Home*, 577 S.W.2d 308 (Tex. Civ. App. -San Antonio 1979)).  "[T]he fraudulent concealment doctrine of § 1113 requires that the defendant engage in *active concealment*-it must undertake some 'trick or contrivance' to 'exclude suspicion and prevent inquiry.'"  *Larson v. Northrop Corp.*, 21 F.3d 1164, 1174 (D.C. Cir. 1994) (emphasis in original).  "Such concealment must rise to something 'more than merely a failure to disclose.'"  *Id.* (citing *Schaefer v. Arkansas Med. Soc'y*, 853 F.2d 1487, 1491 (8th Cir. 1988) (internal citation omitted)).  "While a fiduciary's mere silence could, in some circumstances, amount to fraud, it would fall short of the fraudulent concealment that courts have required for purposes of § 1113."  *Larson*, 21 F.3d at 1174 (citing *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1095 (7th Cir. 1992)).

In this case, the plaintiffs have failed to tender evidence of the defendants' intent to deceive them or of any false representation made by the defendants with regard to the premium increases implemented by them.  During their case-in-chief, Evans testified that the defendants misrepresented the *means* by which the premium increases were authorized at Sterling in their letter dated February 21, 2003, by stating that the Board of Directors had approved the premium increases for Sterling Fibers' retirees when, in fact, it had not.  (Docket Entry No. 152, Trial Tr. at 171 – 176.)  However, testimony elicited from Hale established that the Board of Directors did, in fact, approve the increase in medical premiums for all retirees, including the Sterling Fibers' retirees.  (*See* Docket Entry No. 156, Trial Tr. at 117 -119.)  Evans also testified that the defendants misrepresented that the bankruptcy court had authorized their rejection of the APA and permitted them to increase their medical premiums.  (Docket Entry No. 152, Trial Tr. at 180 – 184.)  He appears to assert that the defendants made a material omission by failing to inform them that they failed to comply with 11 U.S.C. § 1114 when rejecting the APA and thus, their

rejection was improper and unauthorized by the bankruptcy court.  (*Id.*)  Without more, the Court

finds the plaintiffs' argument in this regard unavailing and insufficient to demonstrate that the

defendants engaged in fraud or active concealment so as to permit the plaintiffs to obtain refuge

under the exception applicable to such claims set forth in 29 U.S.C. § 1113(2).

### 2.        The Plaintiffs' ERISA § 502(a)(2) Claim

Notwithstanding the statute of limitations bar, the plaintiffs have also failed to tender

evidence in support of the essential elements of their breach of fiduciary duty claims.  As an

alternative to their claim for denial of benefits and/or enforcement of their rights under the Plan,

the plaintiffs seek to recover against the defendants as fiduciaries with respect to the Plan

pursuant to § 502(a)(2) of ERISA.  They contend that the "[d]efendants, as fiduciaries, breached

the responsibilities, obligations or duties imposed upon them by ERISA by reducing, disposing

of or eliminating the medical and prescription drug benefits."  (Docket Entry No. 99 at ¶ 42,

Count II).  To this end, they argue that the defendants are liable to make good to the Plan any

losses to the Plan resulting from their breach and to restore to the Plan any profits which have

been made through the use of assets of the Plan by the fiduciaries.  (*Id.*)  At trial, Evans stated

that the plaintiffs are seeking to recover their overpaid premiums.  (Docket Entry No. 152, Trial

Tr. at 141).  Additionally, Hale, the Chairman of the Committee, testified that the Plan is a self-

funded plan and generally has no assets.  (Docket Entry No. 156, Trial Tr. at 105:22 - 25).

Section 502(a)(2) of ERISA permits a plan participant or beneficiary to initiate a civil

action on behalf of the plan "for appropriate relief" under § 409, 29 U.S.C. § 1109, which

governs liability for breaches of ERISA's fiduciary duty provisions.  *See* 29 U.S.C. § 1132(a)(2).

Section 409 provides, in pertinent part, that:

> (a) [a]ny person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter

> shall be personally liable to make good to such *plan* any losses to the *plan* resulting from each such breach, and to restore to such *plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a)(emphasis added).  Thus, "[w]hile § [502(a)(2)] does allow a plan participant to sue for 'appropriate relief' for [a] fiduciary breach, the plan participant may only seek relief for the plan."  *Crowell v. Shell Oil Co.*, No. H-05-3412, 2007 WL 446043, *2 (S.D. Tex. Feb. 6, 2007) (internal citation omitted).

The United States Supreme Court has reasoned that the "under the remedial scheme laid out in ERISA, the remedies available under [§ 1109] must inure to the benefit of the plan as a whole."  *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 376 (5th Cir. 2008) (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140, 105 S. Ct. 3085, 87 L. Ed.2d 96 (1985)).  It further explained that "[a] fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary."  *Nichols*, 532 F.3d at 376 (citing *Russell*, 473 U.S at 142, 105 S. Ct. at 3090).  Accordingly, "many courts have held that claims for breach of fiduciary duty under § 502(a)(2) must be brought in a representative capacity on behalf of the plan as a whole, with the goal of protecting the financial integrity of the plan."  *Nichols*, 532 F.3d at 376 (citing *LaRue v. DeWolff, Boberg & Assocs.*, --- U.S. ----, 128 S. Ct. 1020, 1023, 169 L. Ed.2d 847 (2008) (explaining that the court of appeals rejected the petitioner's claim under § 502(a)(2) because the remedy he sought was "personal" and only related to his own plan benefits)).

Because the named plaintiffs have only presented evidence establishing losses for their personal benefit rather than for the Plan itself, the Court finds that the defendants are entitled to

judgment on their claim for breach of fiduciary duty under § 502(a)(2).  *See Nichols*, 532 F.3d at

376 (reasoning that it would be impossible for retirees to produce evidence that an employee

welfare benefit plan sustained losses under ERISA § 502(a)(2) where the plan was a self-funded

employee benefit plan); *see also Shepherd v. Worldcom, Inc.*, No. H-03-5292, 2005 WL

3844069, * 8 n.11 (S.D. Tex. Sept. 9, 2005) (citing *McDonald v. Provident Indem. Life Ins. Co.*,

60 F.3d 234, 237 - 38 (5th Cir. 1995) (noting that "[e]stablishing a loss to the plan-as opposed to

the individual participants-is therefore required to prevail on a § 502(a)(2) breach of fiduciary

duty claim.")).

### 3.     The Plaintiffs' ERISA § 502(a)(3) Claim

The plaintiffs also seek relief from the defendants pursuant to ERISA § 502(a)(3).

Specifically, they contend that the "[d]efendants, as fiduciaries, breached the responsibilities,

obligations, or duties imposed upon them by ERISA and/or the United States Bankruptcy Code

by reducing, disposing of or eliminating the medical and prescription drug benefits."  (Docket

Entry No. 99 at ¶ 45, Count III).  As such, they seek "to enjoin [the] acts or practices [of the

defendants] which violate Section 5.05(f) of the APA, the provisions of ERISA and the terms of

the Plan, to obtain other appropriate equitable relief, to redress the violations, and to enforce the

provisions of ERISA and the terms of the APA and/or the terms of the [P]lan."  (*Id.*)

Section 502(a)(3) authorizes a plan participant or beneficiary to institute a civil action:

"(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the

plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to

enforce any provisions of [ERISA] or the terms of the plan."   29 U.S.C. § 1132(a)(3).

Nevertheless, it is well-settled law that relief under this section is restricted to "appropriate

equitable relief for injuries caused by violations that § 502 does not elsewhere adequately

remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S. Ct. 1065, 1078, 134 L.Ed.2d 130 (1996); *see also Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir. 1998) (reasoning that "[b]ecause [the plaintiff] has adequate relief available for the alleged improper denial of benefits through his right to sue the Plans directly under section 1132(a)(1), relief through the application of Section 1132(a)(3) would be inappropriate."). "When a [participant or] beneficiary wants what was supposed to have been distributed under a plan, the appropriate remedy is a claim for denial of benefits under § 502(a)(1)(B) of ERISA [, 29 U.S.C. § 1132(a)(1)(B),] rather than a [breach of] fiduciary duty claim brought pursuant to § 502(a)(3) [, § 1132(a)(3)]." *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 512 (5th Cir. 2000) (citing *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321, 1335 (5th Cir. 1992)). The Fifth Circuit has reasoned that if a plaintiff has adequate redress for his disavowed claims through his right to initiate a civil action under § 1132(a)(1), he has an adequate remedy and may not also pursue a claim for breach of fiduciary duty under § 1132(a)(3). *Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 639 (5th Cir. 1999); *see also Tolson*, 141 F.3d at 610.

It is undisputed in this case that the plaintiffs sued the Plan directly for the recovery of benefits wrongfully denied and presented evidence at trial reminiscent of the same. Thus, because they have an adequate remedy available for their alleged improper denial through their right to sue the Plan under § 1132(a)(1), they are prohibited from also suing for breach of fiduciary duty under § 1132(a)(3). The fact that they did not prevail on their claim under § 1132(a)(1) is of no consequence and does not make their § 1132(a)(3) claim any more or less viable. *Tolson*, 141 F.3d at 610. Nor does the fact that the plaintiffs have attempted to characterize their relief under § 1132(a)(3) as merely "equitable" relief. *See Amschwand v. Spherion Corp.*, 505 F.3d 342, 348 n.7 (5th Cir. 2007) (citing *Great-West Life & Annuity Ins. Co.*

*v. Knudson*, 534 U.S. 204, 210 -11, 122 S. Ct. 708, 713, 151 L. Ed.2d 635 (2002) (noting that "attempts to recharacterize a desired § 502(a)(3) remedy as a purely equitable form of relief, like an injunction, have been consistently rejected.")).

Moreover, even if a breach of fiduciary duty claim could be pursued by the plaintiffs in this instance, Sterling's amendment and/or modification of its Plan to increase premiums would not give rise to such a claim.  *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S. Ct. 1783, 135 L. Ed.2d 153 (1996) (citing *Curtiss-Wright*, 514 U.S. at 78, 115 S. Ct. at 1228) ("When employers undertake . . . actions [to adopt, modify or terminate welfare plans] they do not act as fiduciaries."); *see also Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 251 (5th Cir. 2008) (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444, 119 S. Ct. 755, 763, 142 L. Ed.2d 881 (1999) ("Excluded from fiduciary responsibilities, however, are the decisions of a plan sponsor to modify, amend or terminate the plan; such decisions are those of a trust settlor, not a fiduciary.")).  Further, testimony offered by Hale at trial demonstrates that the defendants consulted outside legal counsel regarding their obligations under § 1114 of the United States Bankruptcy Code and therefore, a breach of fiduciary duty claim premised on the defendants' failure to secure the same would also fail.  (*See* Docket Entry No. 156, Trial Tr. at 97.) Accordingly, the Court concludes that the defendants are entitled to judgment on the plaintiffs' § 502(a)(3) claim.

### C.    The Plaintiffs' ERISA- Estoppel Claim

Finally, the plaintiffs contend that the defendants' alleged breach of fiduciary duty is actionable on an ERISA-estoppel theory.  Specifically, they allege that the defendants breached their fiduciary duty by misrepresenting that they would provide post-retirement medical and life insurance benefits that were no less favorable to them than those benefits provided by Cytec,

under its plans in effect on or about December 23, 1996.  (Docket Entry No. 99 at ¶ ¶ 47 - 51, Count IV).  The plaintiffs contend that, while believing that Sterling had guaranteed them vested benefits based on the language contained in § 5.05(f) of the APA, they reasonably relied upon the defendants' misrepresentations to their detriment and elected to retire.  (*Id.*) They further contend that the defendants' representations caused them substantial damage and that their claims arise out of extraordinary circumstances.  (*Id.*)

To prevail on an ERISA-estoppel claim under federal common law, a plaintiff is required to establish:  "(1) a material misrepresentation, (2) reasonable and detrimental reliance upon that representation, and (3) extraordinary circumstances."  *Nichols*, 532 F.3d at 374 (citing *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444 – 45 (5th Cir. 2005).  With respect to an ERISA-estoppel claim, "there can be no 'reasonable reliance on informal documents in the face of unambiguous Plan terms.'"  *Nichols*, 532 F.3d at 374 (citing *Mello*, 431 F.3d at 447) (other citation omitted).

During the trial of this action, the plaintiffs offered no evidence sufficient to satisfy any of the aforementioned elements set forth above.  First, they presented no evidence of any material misrepresentation made by the defendants.  In fact, when the Plan documents are scrutinized in their entirety, it becomes apparent that the language contained therein did not guarantee any specific level of benefits and Sterling expressly reserved its right to amend, modify or terminate the Plan at any time.  Second, assuming *arguendo*, that a material misrepresentation had been established, the plaintiffs have failed to establish reasonable and detrimental reliance on such, in light of the unambiguous language contained in the relevant Plan documents.  *See High v. E-Systems, Inc.*, 459 F.3d 573, 580 (5th Cir. 2006) (quoting *Sprague v. GMC*, 133 F.3d 388, 404 (6th Cir. 1998) (reasoning "that a 'party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan

documents available to or furnished to the party.'")).  More importantly, Evans acknowledged during trial that Sterling's Plan, much like Cytec's Plan, contained a reservation of rights clause that included the following language:

> The company expects and intends to continue the plan or reserves the right to amend or terminate at any time.  The company does not guarantee any specific level of benefits or the continuation of any benefits during any periods of active or inactive employment, disability or retirement. . . .  The plan may be amended at any time by action of the plan administrator or board of directors.  This plan may be terminated at any time by action of the board of directors.

(Docket Entry No. 152, Trial Tr. at 123:19 – 125:23.)  Further, neither he nor any of the other named plaintiffs denied ever having received a copy of the Plan or other related documents incorporating such language.  (*Id.*)  As a final point, the Court notes that the plaintiffs have adduced no evidence of the type of "extraordinary circumstances" sufficient to support an ERISA-estoppel claim.  *See High v. E-Systems, Inc.*, 459 F.3d 573, 580 n.3 (5th Cir. 2006); *see also Burstein v. Ret. Account Plan for Emps. of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 383 (3d. Cir. 2003) (quoting *Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1011 (3d. Cir. 1997) (noting that "'extraordinary circumstances,' generally involve acts of bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud.")).  As a consequence, the Court concludes that the defendants are entitled to judgment on the plaintiffs' ERISA-estoppel claim.

## V.    CONCLUSION

Based on the foregoing, the Court holds that the defendants are entitled to judgment dismissing with prejudice the plaintiffs' claims tried to this Court during the bench trial, including the class claim for denial of benefits under ERISA § 502(a)(1)(B).  A judgment in conformity with this Memorandum Opinion and Order will be filed concurrently herewith.

It is so **ORDERED**.

SIGNED at Houston, Texas this 1st day of July, 2010.

_____
Kenneth M. Hoyt
United States District Judge